UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TRADE PAY LLC and MICHAEL T. NUGENT,

                Plaintiffs,

  -against-

GLOBAL STRATEGIES HOLDING CORP., f/k/a
GLOBAL STRATEGIES, INC., and BRUCE A.
WILLIAMS,

                Defendants.
------------------------------------------------------------------X

Civil Action No.  1:25-cv-05335

**COMPLAINT**

**Jury Trial Demanded**

By their attorneys Moskowitz, Colson, Ginsberg & Shulman, LLP, Plaintiffs Trade Pay LLC ("TradePay") and Michael T. Nugent ("Nugent") (collectively, "Plaintiffs"), bring their Complaint against Defendants Global Strategies Holding Corp., f/k/a Global Strategies, Inc. ("Global") and Bruce A. Williams ("Williams," and, collectively with Global, "Defendants"), and allege upon information and belief as follows:

## NATURE OF THE ACTION

This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing.

1.    Plaintiffs are in the business of buying financial instruments and extending loans. These include, but are not limited to, loans between corporations, debts, and accounts receivable, often referred to as "receivables," which are debts owed to a company for goods that have been delivered but not yet paid for.

2.    With regard to receivables, Plaintiffs purchase at a discount these types of financial assets, often invoices reflecting money owed to the counterparty from its customers.  The term of

these transactions – *i.e.*, when the customer is required to repay the non-discounted value of the invoice to Plaintiffs – is generally 90 days after the discounted value of the invoice is transmitted to Plaintiffs' counterparty.

3. By way of example, Plaintiffs purchase accounts receivable at a discount from the original seller of a product, provide immediate funds to the original seller, and then collect payment at a later date when the purchaser of a product is scheduled to pay the invoice.

4. With regard to loans, Plaintiffs extend financing pursuant to commercially reasonable terms, at times in exchange for shares or partial ownership in the companies and at other times based upon strictly financial repayment terms, often in conjunction with personal guarantees from the company's owner as security guaranteeing repayment of the loans.

5. Under normal business practices, these transactions operate smoothly: Plaintiffs negotiate a price for the financial instruments with the company's owner and, in exchange, the company's owner provides necessary documents, information, and representations of cooperation and to remit payment to TradePay according to an agreed-upon schedule.

6. Defendants represented to Plaintiffs that they were interested in entering into certain financial instruments and engaging in certain transactions, including selling their accounts receivables and loans.

7. Plaintiffs agreed over several years to enter into various financial arrangements with Defendants, including the purchase of Company shares, the purchase of certain accounts receivables from Global, and various other financial agreements.

8. Defendants, individually or collectively, have breached multiple obligations to Plaintiffs. Plaintiffs have, on multiple occasions, demanded that Defendants perform under the contracts and make good on their representations and obligations. Despite acknowledgements of

their financial obligations to Plaintiffs, Defendants have failed to satisfy their obligations in ways identified below.

9. Defendants are in breach of their contractual obligations to Plaintiffs and now owe to Plaintiffs collectively approximately $2 million and the delivery of shares in Global.

## PARTIES

10. Plaintiff Trade Pay LLC is a New York limited liability corporation with its principal place of business located in Suffolk County, New York.

11. Plaintiff Michael T. Nugent is an individual who resides in Suffolk County, New York and is the owner and sole member of Trade Pay LLC.

12. Defendant Global Strategies Holding Corp., f/k/a Global Strategies, Inc., is a manufacturer of woven polypropylene contractor clean-up bags and a manufacturer and supplier of Demo Bags. Global is best known for manufacturing Demo Bags, a heavy duty contractor bag purportedly made from recyclable plastics. Global formerly was incorporated in the State of Massachusetts and, as of on or about April 13, 2021, is incorporated in the State of Wyoming, with its principal place of business at 300 E. Boundary Street, Chapin, South Carolina 29036.

13. Defendant Bruce A. Williams is an individual who, upon information and belief, resides in Chapin, South Carolina, and is the CEO and founder of Global.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

15. Venue and jurisdiction are proper in this judicial district pursuant to 28 U.S.C. § 1391, as the Parties, in the Put/Call Option Agreement, agreed to the jurisdiction of the federal district courts in the Southern District of New York to resolve disputes and, in addition, a

substantial number of the events, acts or omissions giving rise to Plaintiffs' claims occurred within the boundaries of this judicial district, including but not limited to many, if not all, the financial transactions alleged below and multiple meetings in mid-town Manhattan to negotiate the Parties' business relationships and agreements.

## FACTUAL BACKGROUND

**Purchase of Receivables**

16. According to Williams, Global could not raise traditional financing and its optimal avenue to obtain capital was to utilize its receivables from highly-rated customers such as Home Depot.

17. In or about February, 2017, TradePay and Global entered into a Receivables Purchase Agreement ("Receivables Purchase Agreement"). TradePay was granted the right, but not the obligation, to purchase, at an agreed-upon discounted amount, invoices, i.e., accounts receivables (collectively, the "Receivables"), reflecting monies due and owing to Global from its customers; Global would receive immediate funds from TradePay in order to operate and TradePay would receive from Global the full payment owed by Global's customers for the goods Global delivered.

18. The Receivables related to specific transactions and products that Global would supply to various buyers, including, but not limited to, Home Depot.

19. The discounted amount to be paid by TradePay and the non-discounted amounts Global was obligated to transfer to TradePay were agreed-upon amounts tied directly to the customer invoice for each particular transaction.

20. Payment by Global to TradePay was to be made 90 days following TradePay's extension of funds to Global.

**Williams' Personal Guaranty**

21. TradePay refused to engage in transactions contemplated in the Receivables Purchase Agreement until Williams executed a personal guaranty.

22. In order to induce TradePay to provide financing to Global pursuant to the Receivables Purchase Agreement, Williams, on March 29, 2017, executed a personal guaranty pursuant to which Williams agreed to be personally liable for all debts TradePay incurred as a result of the obligations incurred pursuant to the Receivables Purchase Agreement (the "Personal Guaranty").

**Transactions Pursuant to the Receivables Purchase Agreement**

23. From May 21, 2018 until October 21, 2018, TradePay engaged in approximately 68 transactions with Global. Over the course of the approximately 68 transactions, TradePay purchased receivables at a discount and, in consideration, Global transferred payments to TradePay the total sum of $3,812,066.52, reflecting the face amount of the invoices to Global's customers. In addition, Global paid TradePay $17,708.45 in late fees for certain of the transactions, reflecting the agreed-upon late fee of two (2) percent per month for sums owed but not repaid according to the Parties' agreed-upon schedule.

24. Starting on November 12, 2018, through May 19, 2022, TradePay engaged in an additional 12 transactions. During that period, TradePay paid to Global the discounted amount of $855,594.09 and purchased receivables in the total amount $886,626.00, the amount Home Depot owed, and in fact paid, to Global with regard to these specific invoices.

25. Global failed and refused to pay to TradePay that entire amount due and owing despite having received the payments from its purchaser, Home Depot (although customer payment to Global was not a prerequisite or condition to Global's obligations to TradePay).

26. In addition to $886,626.00, Global owes late fees to TradePay at the agreed-upon amount of 2 percent per month. Through June 15, 2025, the amount of late fees due and owing to TradePay totaled $888,365.69.

27. Williams failed and refused to satisfy his personal obligations set forth in the Personal Guaranty to pay for Global's debts incurred but not paid to TradePay.

28. As a result of the above, Defendants, individually and severally, owe $1,754,991.69 through June 15, 2025, as a result of Global's default of its obligations set forth in the Receivables Purchase Agreement and Williams' default of his obligations set forth in the Personal Guaranty.

29. Further, despite several and timely demands, Defendants have refused, and failed, to produce a copy of the Receivables Purchase Agreement despite Global's obligations, both to the State of Wyoming and to Plaintiffs, to retain in the ordinary course of its business the business records of the company.

30. Defendants have never disputed, and in fact have agreed, that $1,754,991.69 is due and owing to Plaintiffs.

31. While not challenging the amount of debt owed, Defendants contend that such amount is the result of financing that TradePay provided to Global during this time period in order to purchase containers, including from India, for its product and not as a result of TradePay purchasing company receivables.

32. Plaintiffs dispute such characterization of the debt.

33. The dispute regarding the characterization of the debt does not alter the amount due and owing to Plaintiffs but, rather, has consequences regarding the accounting treatment and priority of the debts owed to Defendants' creditors.

**Stock Purchase Agreement**

34. On or about late summer or early fall, 2020, Williams communicated to Nugent that he was in need of additional liquidity for his then-fledgling business. During that time period, Global started planning to move into a new headquarters and open a production facility in Chapin, South Carolina, notwithstanding that the business had insufficient cash flow to satisfy its current and future financial obligations, including obligations to be incurred by owning and operating the Chapin facility.

34. After discussions and negotiations, Nugent and Williams entered into a Stock Purchase Agreement dated October 2, 2020 ("Stock Purchase Agreement").

35. Pursuant to the Stock Purchase Agreement, Nugent purchased 300 shares of Global common stock from Williams in consideration of a payment of $1 million ("Thirty-Three Hundred Three Hundred Thirty-Three Dollars and Thirty-Three Cents [sic] ($3,333.33) per Share").

36. Nugent duly and timely paid the purchase price of the shares and Williams delivered to Nugent a Stock Certificate representing 300 shares of Global common stock.

**Put/Call Option Agreement**

37. Contemporaneously with entering into the Stock Purchase Agreement, Nugent and Williams entered into a Put/Call Option Agreement, dated October 2, 2020 ("Put/Call Option Agreement").

38. Pursuant to the Put/Option Agreement, Williams was granted the right, but did not undertake the obligation, to purchase from Nugent the 300 shares of Global stock Nugent purchased pursuant to the Stock Purchase Agreement at any time between October 2, 2021 and September 30, 2022, at prices specified in the Put/Call Option Agreement depending upon the date of purchase (the "Call Option").

39. Pursuant to the Put/Call Option Agreement, if Williams had not exercised the Call Option on or before September 30, 2022, Nugent had the right, effective October 3, 2022, but not the obligation, to exercise an option to cause Williams to purchase all, but not less than all, of Nugent's Global shares ("Put Option") at a set price of $1,485,066 (the "Put Option Price").

40. The Put/Call Option Agreement further provided that, in the event Williams defaulted on his obligations to purchase the shares if Nugent exercised the Put Option, including the failure to pay the full amount of the Put Option Price, the balance of the purchase price would be converted into additional shares of Williams' equity in Global, which Williams would thereby be obligated to deliver immediately.

41. In the event of such conversion, Nugent would thereby hold total aggregate shares in Global equivalent to the pro rata percentage of the balance of the Put Option Price against the amount of funds Global contributed to purchase the Chapin, South Carolina manufacturing property and plant.

42. The Put/Call Option Agreement provided an example of how such default transfer calculation would operate: "… if the Company contributes $2 million [to purchase the Chapin, South Carolina manufacturing property and plant], and the Put Option Price balance is $1 million, Nugent shall receive 33.33% of the Company's issue and outstanding shares."  The Put/Call Option Agreement further provided that Nugent's shares would be non-dilutable.

43. Pursuant to the Put/Call Option Agreement, Williams was obligated to provide to Nugent complete and accurate Global financial information.  Williams failed to satisfy his duty and obligation to provide such Global financial records despite multiple requests, including Defendants' obligation to notify Nugent of Global's total capital contributions for the purchase of the Chapin property within thirty (30) days of closing.

44. The Put/Call Option Agreement provided for jurisdiction of disputes in the United States District Court for the Southern District of New York and, further, provided that the laws of the State of Massachusetts would govern the transactions and obligations set forth in the Put/Call Option Agreement.

45. Williams did not exercise his Call Option pursuant to the Put/Call Option Agreement.

46. On September 26, 2022, Nugent exercised his Put Option under Article II of the Put/Option Agreement, thereby requiring Williams to purchase from Nugent the 300 shares of Global common stock.

47. Williams failed to fulfill his obligation to purchase Nugent's 300 shares of Global common stock.

48. On October 7, 2022, Nugent provided notice of default pursuant to the Put/Call Option Agreement, and demanded that physical shares in the amount established pursuant to the Put/Call Option Agreement be duly delivered.

49. Pursuant to the formula set forth in the Put/Call Option Agreement, and in accord with Global's contribution to purchase the Chapin, South Carolina manufacturing property and plant, as set forth in the limited financial records Defendants provided to Nugent, Nugent is the rightful owner of 48.36 percent of Global's common stock.

50. On multiple occasions, both orally and in writing, Nugent has made demand for the physical delivery of such shares, as is his right.

51. Williams on multiple occasions has acknowledged his default, yet has failed and refused to satisfy such obligations.

## COUNT I

### Breach of Contract (As Against Global)
### Receivables Purchase Agreement

52. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

53. TradePay and Global, in exchange for valuable consideration, entered into the Receivables Purchase Agreement.

54. TradePay has performed all of its obligations under the Receivables Purchase Agreement.

55. Global has breached its obligations under the Receivables Purchase Agreement.

56. As a result of the foregoing conduct, TradePay has suffered damages in an amount to be proven at trial but in an amount no less than $1,754,991.69.

57. Global's conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving TradePay of property or legal rights or otherwise causing injury, and in conscious disregard of TradePay's rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing
### (As Against Global)
### Receivables Purchase Agreement

58. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

59. In entering into the Receivables Purchase Agreement, TradePay relied upon Global to deal fairly and to take no action that would prevent or hinder TradePay from collecting the funds that were due and owing.

60. In addition to the terms of the Receivables Purchase Agreement, Global impliedly covenanted that it would deal with TradePay fairly and in good faith and would not arbitrarily, capriciously, or without good cause deprive TradePay of the benefit of its bargain, or wrongfully deprive TradePay of its rights to obtain the Receivables and other benefits under the Receivables Purchase Agreement.

61. By the acts alleged above, Global breached its implied covenant of good faith and fair dealing, and each of its other covenants set forth above.

62. As a result of the foregoing conduct, TradePay has suffered damages in an amount to be proven at trial but in an amount no less than $1,754,991.69.

63. Global's conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving TradePay of property or legal rights or otherwise causing injury, and, therefore, was in conscious disregard of TradePay's rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## COUNT III

### Breach of Contract (As Against Williams)
### Put/Call Option Agreement

64. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

65. Nugent and Williams, in exchange for valuable consideration, entered into the Put/Call Option Agreement.

66. Nugent has performed all of his obligations under the Put/Call Option Agreement.

11

67. Williams has breached his obligations under the Put/Call Option Agreement.

68. As a result of the foregoing conduct, Nugent has been deprived of his bargained-for consideration, including but not limited to the physical delivery of 48.36 percent of Global's common stock.

69. Williams' conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving Nugent of property or legal rights or otherwise causing injury, and in conscious disregard of Nugent's rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## COUNT IV

### Breach of the Covenant of Good Faith and Fair Dealing
### (As Against Williams)
### Put/Call Option Agreement

70. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

71. In entering into the Put/Call Option Agreement, Nugent relied upon Williams to deal fairly and to take no action that would prevent or hinder Nugent from obtaining the consideration for which he bargained.

72. In addition to the terms of the Put/Call Option Agreement, Williams impliedly covenanted that he would deal with Nugent fairly and in good faith and would not arbitrarily, capriciously, or without good cause deprive Nugent of the benefit of his bargain, or wrongfully deprive Nugent of his rights under the Put/Call Option Agreement.

73. By the acts alleged above, Williams breached his implied covenant of good faith and fair dealing, and each of his other covenants set forth above.

74. As a result of the foregoing conduct, Nugent has been deprived of his bargained-for consideration, including but not limited to the physical delivery of 48.36 percent of Global's common stock.

75. Williams' conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving Nugent of property or legal rights or otherwise causing injury, and, therefore, was in conscious disregard of Nugent's rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

### COUNT V
### Breach of Contract (As Against Williams)
### Personal Guaranty

76. Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

77. Nugent and Williams, in exchange for valuable consideration, including for Nugent agreeing to enter into the Receivable Purchase Agreement and thereafter to engage in transactions under the Receivables Purchase Agreement, negotiated and executed Williams' Personal Guaranty.

78. Nugent has performed all of his obligations required in consideration of the Personal Guaranty.

79. Williams has breached his obligations under the Personal Guaranty.

80. As a result of the foregoing conduct, Nugent has suffered damages in an amount to be proven at trial but in an amount no less than $1,754,991.69.

81. Williams' conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving Nugent of property or legal rights or otherwise causing injury, and in conscious disregard of Nugent's rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## **COUNT VI**

### **Breach of the Covenant of Good Faith and Fair Dealing**
### **(As Against Williams)**
### **Personal Guaranty**

82.　　Plaintiffs repeat and reallege the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

83.　　In demanding and receiving the Personal Guaranty in consideration for agreeing to enter into the Receivables Purchase Agreement, Nugent relied upon Williams to deal fairly and to take no action that would prevent or hinder Nugent from obtaining the consideration for which he bargained.

84.　　In addition to the terms of the Personal Agreement, Williams impliedly covenanted that he would deal with Nugent fairly and in good faith and would not arbitrarily, capriciously, or without good cause deprive Nugent of the benefit of his bargain, or wrongfully deprive Nugent of his rights under the Personal Guaranty.

85.　　By the acts alleged above, Williams breached his implied covenant of good faith and fair dealing, and each of his other covenants set forth above.

86.　　As a result of the foregoing conduct, Nugent has been deprived of his bargained-for consideration, including but not limited to an amount to be proven at trial but in an amount no less than $1,754,991.69.

87.　　Williams' conduct, as alleged above, was willful, malicious, and intentional, and done for the purpose of depriving Nugent of property or legal rights or otherwise causing injury, and, therefore, was in conscious disregard of Nugent's rights, so as to justify an award of exemplary and punitive damages in an amount to be established at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs Trade Pay LLC and Michael T. Nugent seek judgment in their favor and against Defendants Global Strategies Holding Corp., f/k/a Global Strategies, Inc. and Bruce A. Williams as follows:

(i) On Count I, for breach of contract, i.e., breach of the Receivables Purchase Agreement, as against Global, damages payable to TradePay in an amount to be determined at trial but no less than $1,754,991.69;

(ii) On Count II, for breach of the covenant of good faith and fair dealing, i.e., breach of the Receivables Purchase Agreement, damages as against Global and payable to TradePay in an amount to be determined at trial but no less than $1,721,905.82;

(iii) On Count III, for breach of contract, i.e., breach of the Put/Call Option Agreement, as against Williams, Specific Performance, i.e., the physical delivery by Williams to Nugent of 48.36 percent of Global's common stock, for Declaratory Relief, declaring that Nugent owns 48.36 percent of Global's common stock, and declaring that Nugent is entitled to the beneficial interest to 48.36 percent of Global's common stock dating back to the date of default;

(iv) On Count IV, for breach of the covenant of good faith and fair dealing, i.e., breach of the Put/Call Option Agreement, as against Williams, for Specific Performance, i.e., the physical delivery by Williams to Nugent of 48.36 percent of Global's common stock, and for Declaratory Relief, declaring that Nugent owns 48.36 percent of Global's common stock, and declaring that Nugent is entitled to the beneficial interest to 48.36 percent of Global's common stock dating back to the date of default;

(v) On Count V, for breach of contract, i.e., breach of the Personal Guaranty, damages as against Williams and payable to Nugent in an amount to be determined at trial but no less than $1,754,991.69;

(vi) On Count VI, for breach of the covenant of good faith and fair dealing, i.e., breach of the Personal Guaranty, damages as against Williams and payable to Nugent in an amount to be determined at trial but no less than $1,754,991.69;

(vii) For punitive damages;

(viii) For pre-judgment interest at the maximum rate permitted by law;

(ix) For recovery of attorney's fees as provided by law, contract, or statute;

(x) For costs; and

(xi) For any other and further relief as the court may deem proper.

Dated: New York, New York
June 26, 2025

By: /s/ Peter R. Ginsberg
Peter R. Ginsberg
Moskowitz Colson Ginsberg & Schulman LLP
80 Broad Street, Suite 1900
New York, NY 10004
pginsberg@mcgsllp.com
Telephone: (212) 257-6455

*Counsel for Plaintiffs*